**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SYLVIA SAMUEL JACKSON,** | : | |
| **Plaintiff** | : | |
| **v.** | : | **CIVIL ACTION NO. 3:13-00886** |
| **CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY,** | : | **(JUDGE MANNION)** |
| | : | |
| **Defendant** | : | |

### MEMORANDUM

### 1.  Introduction

Plaintiff Sylvia Samuel Jackson has filed this action pursuant to 42 U.S.C. §405(g) seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Jackson's claims for social security disability insurance benefits and supplemental security income benefits.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. Jackson met the insured status requirements of the Social Security Act through September 30, 2012. Tr. 18, 198.[1]

Supplemental security income is a federal income supplement program designed to help aged, blind or other disabled individuals who have little or no income. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Jackson protectively filed her applications for social security disability insurance benefits and supplemental security income on November 4, 2009,

---

[1]References to "Tr._" are to pages of the administrative record filed by the Defendant as part of the Defendant's Answer.

claiming that she became disabled on July 17, 2008. Tr. 180, 185. Jackson has been diagnosed with hypertension, obesity, a small plantar calcaneal spur in the left foot, plantar fasciitis of the left foot, pes planus, and schizopherniform disorder.[2] Tr. 18. On April 28, 2010, Jackson's applications were initially denied by the Bureau of Disability Determination. Tr. 82, 94.

On May 12, 2010, Jackson requested a hearing before an administrative law judge ("ALJ"). Tr. 106. The ALJ conducted a hearing on September 19, 2011, Jackson was not represented by an attorney.[3] Tr. 32-75. On February 3, 2012, the ALJ issued a decision denying Jackson's applications. Tr. 16-25. On February 14, 2013, the Appeals Council declined to grant review. Tr. 1. Jackson subsequently filed a complaint before this Court on April 8, 2013. Supporting and opposing briefs were submitted and this case became ripe for disposition on August 30, 2013, when Jackson declined to file a reply brief.

Jackson appeals the ALJ's determination on five grounds: (1) the ALJ failed to consider the totality of the evidence, (2) the ALJ erred in failing to give controlling weight to the opinion of Jackson's treating physician, (3) the vocational expert's testimony did not constitute substantial evidence at step five of the sequential evaluation process, (4) the ALJ failed to fully and fairly develop the record, and (5) remand is required due to "new and material" evidence. For the reasons set forth below, the decision of the Commission is

---

[2] Schizopherniform disorder is identical to schizophrenia, except that schizopherniform disorder lasts or is expected to last from one to six months. See, *Stedman's Medical Dictionary,* 570 (28th Ed. 2006).

[3] A hearing had initially been scheduled for April 28, 2011. Tr. 126. Jackson's attorney was present for the hearing, but Jackson did not arrive because she was incarcerated at the time in Dauphin County Prison. Tr. 41. At that time, Jackson's attorney withdrew from the case because she had been unable to contact Jackson. Tr. 153.

affirmed.

## 2. __Statement of Relevant Facts__[4]

Jackson is 40 years of age, has an associate's degree in business administration, and is able to read, write, speak, and understand the English language. Tr. 54, 55, 201. Jackson's past relevant work includes work as a commercial cleaner, which is classified as heavy, unskilled work, as a security guard, which is light, semi-skilled work, and as a store laborer, which is medium, unskilled work. Tr. 68.

## A. __Jackson's Mental Impairments__

The first suggestion of Jackson's mental impairments occurred on July 27, 2009, when Jackson presented to the emergency room with multiple complaints regarding side-effects of her medications. Tr. 402. Jackson was examined by Carlo DeAugustine, D.O., who opined that, though Jackson was alert and in no acute distress, "she [was] quite anxious and appear[ed] to be having a panic attack." Id. All physical examinations and tests were negative, and Dr. DeAugustine diagnosed Jackson with acute anxiety. Tr. 403.

On September 9, 2009, Jackson presented to her primary care physician, Richard Presner, M.D. Tr. 318. Jackson was alert and oriented times three, but "refused to answer questions," "complained of being asked questions," and was paranoid about the appointment. Id. Approximately one

---

[4] Jackson suffered from several physical impairments in addition to mental impairments. Tr. 18. Jackson only challenges the ALJ's determination regarding Jackson's mental impairments; therefore, records of Jackson's physical impairments will only be addressed to the extent necessary to adequately explain her mental impairments.

week later, Jackson returned to Dr. Presner with symptoms of an anxiety attack. Tr. 316. She complained of a "stressful life being a single mom of 3 boys" and requested medication to calm herself down. Id.

On December 11, 2009, Jackson returned to Dr. Presner. Judith Schamback, a register nurse, wrote that it was "very difficult getting a history from [Jackson]. She [has a] very slow, strange affect." Tr. 312. On December 31, 2009, Dr. Presner opined that Jackson was temporarily unable to work, but would be able to work again beginning June 1, 2010. Tr. 283-85. On January 15, 2010, Jackson informed Dr. Presner that she did not want to be treated for anxiety and did not want medication. Tr. 305, 308. Jackson was diagnosed with anxiety. Tr. 308.

Thereafter, Jackson did not seek treatment for any mental impairment until 2011.[5] On January 5, 2011, Jackson visited the emergency room with a variety of complaints. Tr. 400. Jackson was agitated and having "considerable difficulty with her neighbors being quite loud." Id. Jackson denied auditory hallucination, and did not appear to be delusional or hallucinating. Id. However, she complained that she developed chest pain "when she feels very stressed by her arguing neighbors." Id. Jackson was diagnosed with anxiety. Tr. 401.

On January 25, 2011, Jackson presented to T.W. Ponessa & Associates ("T.W. Ponessa") for an initial evaluation related to her mental impairments. Tr. 407. Jackson was diagnosed with psychotic disorder, not otherwise

---

[5] Jackson had two medical visits relating to her physical condition that mentioned possible mental impairments. On January 27, 2010, Jackson mentioned that she believed the pain in her left heel was a "mental pain." Tr. 297. On February 1, 2010, Jackson presented for an initial evaluation for physical therapy. R. 339. Jackson "demonstrated clenching of fists/anxiety throughout" the evaluation. Id.

specified, and assessed with a GAF score of 45.[6] Id. Although Jackson resided with three boys, her family and social supports were minimal. Id. Jackson was "not taking psychotropic medications; however, she [was] prescribed Buspirone HCL . . . and refused to take the medication." Id. Jackson reported that her neighbors are able to control her thoughts and that when she is thinking that they can hear her thoughts and remind her that they know what she is thinking. She asserts that she does not take her psychotropic medication because her neighbor knows when she takes the med and therefore she (the neighbor) acts out even more. Id.

On April 13, 2011, Jackson presented to Yury Yaroslavsky, M.D., a psychologist at T.W. Ponessa, for a psychiatric evaluation. Tr. 395. Dr. Yaroslavsky observed that Jackson was an "extremely poor historian and in addition, her thought process is severely disorganized." Id. Jackson reported that she had been anxious and overwhelmed over the previous two years, and "believed the neighbors make different noises intentionally to influence her thoughts or to affect '[her] soul.'" Id. Jackson denied any hallucinations. Dr. Yaroslavsky wrote that "it is unclear if the noises she hears are real noises and she just misinterprets the events or those are the product of her own mind." Id.

Jackson believed that "she is a businesswoman and her multiple caregiver responsibilities [were] keeping her from building a successful career." Tr. 396. Jackson had no history of psychiatric admissions or

---

[6] A GAF score of 41-50 is indicative of "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Diagnostic and Statistical Manual of Mental Disorders,* 34 (4th ed., Text rev., 2000).

treatment with medications. Tr. 395. She denied ever feeling significantly depressed, and denied a history of mania or suicidal or homicidal ideation. Id. Dr. Yaroslavsky opined that Jackson's anxiety "tends to be situational." Id. Jackson had previously tried individual psychotherapy with T.W. Ponessa, but "refused to continue." Tr. 396.

At this appointment, Jackson "showed good eye contact but her speech was severely disorganized. [Her] [t]hought process was sometimes incoherent." Id. Jackson also demonstrated looseness of association and reference, and "endorsed some paranoid delusions." Id. She admitted that her neighbors were trying to read her mind and "influence her by moving her furniture at home." Id.

Jackson had an anxious mood, but denied suicidal or homicidal ideation. Id. Her affect "appeared perplexed and not always appropriate to the content of thought." Id. Jackson was oriented times three, but showed significant difficulties with concentration; her memory seemed intact and she did not exhibit any abnormal or involuntary movements. Id. Dr. Yaroslavsky assigned Jackson a GAF score of 45-50. Id. Dr. Yaroslavsky prescribed Risperdal, an anti-psychotic medication; Jackson refused individual psychotherapy. Tr. 398.

On July 27, 2011, Jackson returned to Dr. Yaroslavsky for a medication management appointment. This was the last appointment record available to the ALJ. Tr. 410. Dr. Yaroslavsky diagnosed Jackson with schizophrenia, paranoid type, and assigned her a GAF score of 45-50. Id. Jackson stated that she was "doing quite well" and feeling "mellow. Things are not bothering me anymore." Id. Dr. Yaroslavsky inquired about Jackson's neighbors bothering her and she replied that she did not "think about this

anymore." Id. Jackson denied changes in her medical condition or any side effects from her medication. Id. Jackson was taking Risperdal, Celexa, and Ativan for her mental impairments. Id.

Dr. Yaroslavsky opined that Jackson was pleasant and cooperative. Id. She was not in acute distress; she was quiet, but maintained sufficient eye contact. Id. Her thought process was linear, and although she did not volunteer much information, she was coherent. Id. Jackson denied suicidal or homicidal thoughts and did not demonstrate any abnormal or involuntary movements. Id. She was alert and oriented times three, though her insight appeared to be limited to fair. Id. Jackson had reduced her use of Ativan. Tr. 411. Jackson requested that her next appointment not be for another two months. Dr. Yaroslavsky agreed with this request, stating that it was "a reasonable request since she is doing quite well." Id.

## B.   Residual Functional Capacity Assessments

On May 18, 2010, M. Ralph Picciotto, M.D. examined Jackson and offered a residual functional capacity assessment. Tr. 352-59. She denied symptoms of mania, hypomania, obsessions, or compulsions. Tr. 356. Jackson admitted that she believed "people can hear her thoughts and read her mind." She also reported sometimes seeing flickering lights. Id. She was frequently overwhelmed by the feeling that "people are out to get her in some way." Tr. 357. At that point in time, Jackson had never been to a psychiatric hospital, had never seen a psychiatrist, and had never taken any anti-psychotic medications. Id.

Though Jackson was dressed in "somewhat unusual garb," she was pleasant with a polite mood and somewhat superficial affect. Tr. 358. She was

alert and oriented times three, had good long and short term memory, good concentration, and tended to be concrete. Id. However, Jackson demonstrated a "marked formal thought disorder" that was "evidenced by tangentiality and non sequitur responses." Id. Dr. Picciotto diagnosed Jackson with schizopherniform disorder. Id. Dr. Picciotto opined that Jackson had marked limitations in her ability to (1) intact appropriately with the public, and (2) respond appropriately to work pressures in a usual work setting. Tr. 353.

On April 6, 2010, Richard Small, Ph.D. reviewed Jackson's medical records and opined that Jackson was moderately limited in her ability to (1) maintain attention and concentration for extended periods, and (2) respond appropriately to changes in the work setting. Tr. 364-65. Dr. Small believed that Jackson could make simple decisions, carry out very short and simple instructions, and sustain an ordinary routine without special supervision. Tr. 366. He also believed that there were "no restrictions in [Jackson's] abilities in regard to understanding and memory and social interaction." Id. Dr. Small concluded that "the limitations resulting from the impairment do not preclude [Jackson] from performing the basic mental demands of competitive work on a sustained basis." Id.

### C.    Jackson's Written Statements

In her functional report from February 2010, Jackson reported that she fixed dinner for her three children after school and helped them with their homework.[7] Tr. 219. She stated that her impairments did not prevent her from doing any chores around the house, although she slowed "down some for

---

[7] During the initial interview with Jackson on December 15, 2009, her interviewer reported that Jackson sounded "like she was on something . . . speech was a little slurred, and she could not concentrate." Tr. 199.

[her] children [sic] sake." Tr. 220. Jackson cooked meals five days a week, was able to shop, pay bills, and go out alone. Tr. 221-22. She had no problems getting along with others. Tr. 224. However, Jackson did complain of a "mental problem," and complained that it was "a long going condition." Id. She handled instructions well, got along well with authority figures, and handled stress well. Tr. 224-25. Although changes in routine aggravated her, she found it to be "workable." Tr. 225. Jackson reported that, due to her ankle and foot issues, she did not believe she would be able to work as hard as she had in the past. Id.

Jackson later completed a disability report for her appeal to the ALJ. Tr. 234-43. In this report, Jackson stated that she often became mentally and physically drained, which took her off task professionally. Tr. 237. She reported that, when she was mentally drained, it was "hard to think clearly." Id. Jackson complained that her brain was overly worked and strained from medications "which will cause me risks with my job proformances [sic] daily." Tr. 243. She stated that she must have a job that offers a mental and physical "balance." Id.

### D.   The Administrative Hearing

On September 19, 2011, Jackson's administrative hearing was conducted. Tr. 32-75. At the hearing, Jackson testified that she had been searching for jobs since 2008 without success. Tr. 50. She stated that she would have taken a job if she had been offered one. She believed that she would have been able to go to work every day. Tr. 58. Jackson believed the only thing that would have affected her ability to perform the job were issues with her feet and legs. Id. Jackson later reiterated that the primary issue

affecting her ability to work was stiffness in her foot. Tr. 61-62. Jackson testified that she did not have problems being around other people, supervisors, or the public. Tr. 63-64. She further testified that, if she took her medication, she "should be okay" to work. Tr. 65.

Jackson was able to care for her personal hygiene, shop for groceries, cook, clean, do the laundry, mop and sweep. Tr. 55-56. Otherwise, Jackson stated that she did very little during the day other than meditate and read mystery books or newspapers. Tr. 56-58.

After Jackson testified, Michael Kibler, an impartial vocational expert, was called to give testimony. Tr. 65. The ALJ asked Mr. Kibler to assume a hypothetical individual with Jackson's age, education, and work experience who could perform light work[8] but was limited to simple, routine, repetitive tasks. Tr. 68-69. The individual must also be allowed to sit or stand at will throughout the workday. Tr. 69. Under this hypothetical, Mr. Kibler testified that the individual would be unable to perform any of Jackson's past relevant work. Tr. 68. However, Mr. Kibler testified that the individual would be able to perform three jobs that exist in significant numbers in the national economy: a small parts assembler, an electronic accessories assembler, or a table worker. Tr. 69-70.

---

[8] Light Work is defined by the regulations of the Social Security Administration as work "with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §416.967.

Thereafter, Jackson stated that fumes and smells do not "agree with" her medication. Tr. 72. The ALJ then modified the hypothetical question so that the hypothetical individual must avoid concentrated exposure to fumes or odors, with all other restrictions remaining intact. Tr. 73. Under this scenario, Mr. Kibler testified that the individual would still be able to perform all three jobs. Id.

### E.    Evidence Submitted Post-Decision

Records submitted by Jackson after the ALJ issued her decision include four letters submitted by Jackson's physicians, all opining that Jackson was temporarily unable to work. Tr. 560-69. On June 17, 2010, Dr. Presner stated that Jackson was unable to work until June 1, 2011 due to anxiety, depression, hypertension, and obesity. Tr. 560-62. On July 5, 2011, Emily Williams, M.D., a physician at Dr. Presner's office, opined that Jackson had "limited employability" due to hypertension, depression, and anxiety. Tr. 563-65. On September 22, 2011, Dr. Yaroslavsky stated that, due to schizophrenia, Jackson was unable to work until December 22, 2011. Tr. 567. On December 8, 2011, Dr. Yaroslavsky opined that Jackson would be unable to work until June 7, 2012. Tr. 569.

On April 16, 2011, Jackson was taken to Dauphin County Prison, where she was given a "receiving screening" by PrimeCare Medical, Inc. Tr. 509-19. Jackson did not appear anxious, was coherent, and showed no signs of mental illness. Tr. 511. She showed no signs of depression and was not a suicide risk. Tr. 510-11. Jackson was neither acting out nor talking in a strange manner, her history and physical appearance did not suggest psychiatric conditions. Tr. 511. She was alert and oriented times three, had

an appropriate mood and affect, an appropriate appearance, and appropriate perception and thought processes. Tr. 515. Jackson did not have hallucinations. Her conversation was appropriate, her speech was normal, and her mood was euthymic. Tr. 517. Jackson indicated that her medications, including Risparadol, were effective.[9] Tr. 518.

On April 18, 2011, Enos Martin, M.D. noted that Jackson was "loose in associations, tangential, pressured, tearful, not suicidal." Tr. 555. Dr. Martin recommended that Jackson receive her medication "to control psychosis." Id. On April 21, 2011, Jackson reported that she was "more stable since her medication ha[d] been increased." Id. At an April 28, 2011 medication check, Jackson was "doing better" and was "thinking more clearly." Tr. 556. Jackson was pleasant and more coherent. She was not suicidal and was not overtly psychotic. Id. On May 8, 2011, Jackson was assessed as "stable." Id.

By May 25, 2011, Jackson had a euthymic mood and a mildly blunted affect. Tr. 557. Dr. Martin noted that Jackson "may still be a bit loose in associations" when under stress. Id. Consequently, Dr. Martin assessed Jackson as "stable, but still fragile." Id. On June 6, 2011, Jackson had no complaints, was pleasant, and stated that she was feeling better. Id. She was assessed as being "relatively stable." Id. On June 15, 2011, Jackson was doing well and was content with her medications. Tr. 557-58. She had a mildly blunted affect, but was not suicidal and was not hearing voices. Tr. 558. She was again assessed as stable, but "fragile." Id.

On September 21, 2011, Jackson presented to Dr. Yaroslavsky for a medication check-up. Tr. 570. Jackson had no complaints, although she did

---

[9] The prison records indicate that Jackson received her anti-psychotic medications throughout her time in Dauphin County Prison. Tr. 528-37.

experience some anxiety relating to bills and other matters. Id. On November 16, 2011, Jackson returned to Dr. Yaroslavsky. She presented with no complaints and "described herself as doing well." Tr. 572. Jackson had gained weight due to her medication, as a result, Dr. Yaroslavsky recommended that she discontinue use of Risparadol. Tr. 573. Jackson insisted on continuing with Risparadol, and Dr. Yaroslavsky wrote "I believe she is capable to make an informed decision in this regard and I respect it." Id.

On January 11, 2012, Jackson was experiencing no psychosis. Tr. 574. Though she reported that her neighbors were still making noise, she did not "believe it [was] intentional and only hears them communicating among themselves." Id. Dr. Yaroslavsky opined that Jackson did not "seem to have any ideas of reference but might still have some residual paranoid thoughts though this does not seem to be a stressor for her." Id.

At all three appointments, Dr. Yaroslavsky reached the following findings: Jackson was pleasant and cooperative, although she was quiet, she demonstrated sufficient eye contact. Tr. 570, 572, 574. Her thought process was linear, and although she did not offer much information, she was coherent. Id. She had a slightly constricted affect, but described her mood as "good" and denied psychosis or suicidal or homicidal ideation. Id. Jackson was alert and oriented times three, her judgment was limited to fair, and she had no abnormal or involuntary movements. Id. Dr. Yaroslavsky assigned Jackson a GAF score of 45-50 at each appointment. Id.

The additional evidence submitted by Jackson included a Guardianship Agreement and a Temporary Consent Order. Tr. 584-91. Both agreements were signed while Jackson was in the custody of Dauphin County Prison. Id. In the Guardianship Agreement, Jackson agreed to release guardianship of

one of her sons to his maternal aunt. Tr. 584. A note on the Guardianship Agreement indicates that on June 18, 2011, after being released from prison, Jackson revoked this agreement. Id. The Temporary Consent Order granted sole legal custody over two of Jackson's sons to their biological father. Tr. 587. Jackson was allowed supervised custody over the children upon release from prison, the visits would be supervised until Jackson obtained a release from a psychologist and resolved her outstanding criminal charges. Tr. 588.

Jackson also attached several documents to her initial brief, documents that were presented for the first time to this Court. (Doc. 10, Ex. A, B). Exhibit B consists of three EMS reports for 2009 and one EMS report from 2011. In July 2009, Jackson complained to the paramedics that her medication "gave her the feeling of having intercourse," and complained that she was healthy and thus should not be taking medication. She complained of psychiatric problem, and was brought to the hospital. In January 2011, Jackson complained of a cracking feeling in her chest that would come and go, and was brought to the hospital.

### 3.    Discussion

In an action under 42 U.S.C. §405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence. Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). Substantial evidence has been

described as more than a mere scintilla of evidence but less than a preponderance. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). In an adequately developed record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims. See 20 C.F.R. §404.1520; Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91-92 (3d Cir. 2007). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed

impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §404.1520. The initial burden to prove disability and inability to engage in past relevant work rests on the claimant, If the claimant meets this burden, the burden then shifts to the Commissioner to show that a job or jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason, 994 F.2d at 1064.

## A. Evaluation of Evidence and Weight Given to the Treating Physician

Jackson argues that the ALJ failed to consider the totality of the evidence before her, and erred in failing to give controlling weight to the opinion of Jackson's treating physician. Much of Jackson's argument focuses on evidence submitted after the ALJ rendered her decision cannot be considered in determining whether the decision was supported by substantial evidence. See, Matthews v. Apfel, 239 F.3d 589, 594 (3d Cir. 2001). Therefore, only the evidence that was submitted prior to the ALJ's decision will be considered in review of the ALJ's decision.

## B.     The ALJ's Credibility Determination

The ALJ relied upon substantial evidence in determining that Jackson was not disabled. Contrary to Jackson's argument, the ALJ did consider all of the evidence that was available before rendering her decision. The ALJ considered Jackson's personal statements relating to her difficulty "remembering and completing tasks," as well as her mental health problems.

Tr. 20. However, the ALJ noted that Jackson had reported caring for three children, shopping, and doing household chores without difficulty. Tr. 19. The ALJ further noted that Jackson was able to handle her finances, follow written and spoken instructions, and perform activities without reminders. Id. Jackson was able to get along with others, and consistently presented as cooperative and pleasant. Id. However, the ALJ believed that Jackson's schizopherniform disorder, accompanied by paranoid ideation, was a severe disorder. Tr. 18.

The totality of this evidence led the ALJ to conclude that, though Jackson's mental impairment could reasonably be expected to cause the alleged symptoms, Jackson's testimony regarding those symptoms was "not credible . . ." Tr. 21. Although Jackson alleged disabling symptoms, her self-reported activities and abilities contradicted such as finding. Tr. 19. Additionally, the medical evidence indicated that Jackson's mental impairment was not disabling. In January 2011, Jackson's mental impairment likely severely impacted her ability to work. Tr. 407. In April 2011, Jackson continued experiencing paranoid ideation, and believed her thoughts were being controlled by others. Tr. 395. However, at the April 2011 appointment, Jackson was prescribed anti-psychotic medications for the first time. Tr. 398. By July 2011, Jackson reported "doing quite well," and no longer reported paranoid ideation. Tr. 410. Jackson was pleasant and cooperative, and reported using less medication. Tr. 411. Jackson felt so well that she requested she not be seen for two months, Her treating physician agreed to this request because Jackson was doing so well. Id.

When viewed in the aggregate, substantial evidence supported the ALJ's credibility determination. The evidence indicates that, as of early 2010, Jackson's mental impairment had little impact on her day-to-day life. Tr. 219-

25. While Jackson later experienced significant issues related to her mental impairment, these issues were mostly resolved by July 2011. Consequently, there is no basis upon which to disturb the ALJ's determination, particularly in light of the deference that is properly owed to the ALJ's credibility determinations. See, Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003).

### C.    Treatment of the Treating Physician's Opinion

The preference for the treating physician's opinion has been recognized by the United States Court of Appeals for the Third Circuit and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the administrative law judge may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Id. at 317 (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). In choosing to reject the evaluation of a treating physician, an administrative law judge may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. Id. A treating physician's opinion must be given controlling weight where that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 CFR §404.1527 (d)(2).

The ALJ was presented with two assessments of Jackson's residual functional capacity; one assessment was provided by a non-examining physician, and one was provided by a non-treating, examining physician. Tr. 352-59, 364-66. Dr. Picciotto examined Jackson prior to Jackson receiving

any treatment for her mental impairment. Tr. 353. Dr. Picciotto opined that Jackson had marked difficulties in dealing with the public and responding appropriately to pressures in a usual work setting. Id. The ALJ gave "little weight" to this opinion, reasoning that the restrictions were overstated in comparison with the objective findings. Tr. 23. Additionally, the ALJ found it noteworthy that Jackson was not receiving treatment at the time of the examination, and had declined psychological counseling. Id. These limitations were also undermined by Jackson's own testimony, such as her statement that she had no issues with the public or being around other people. Tr. 63-64.

In April 2010, Dr. Small reviewed Jackson's medical records and opined that she was moderately limited in her ability to maintain attention and concentration for extended periods, and in her ability to respond appropriately to changes in a work setting. Tr. 364-65. Despite these issues, Dr. Small believed that Jackson was able to meet the basic mental demands of competitive work on a sustained basis. Tr. 367. In reaching this conclusion, Dr. Small opined that Dr. Picciotto's assessment was inconsistent with the medical and non-medical evidence contained within the record. Tr. 366. Dr. Small believed that Dr. Picciotto's assessment was based on a snapshot of Jackson's functioning, and was an overestimate of the severity of her limitations. Id. The ALJ gave great weight to Dr. Small's opinion, reasoning that it was consistent with Jackson's clinical history, her self-reported activities of daily living, and her "improvement with medication." Tr. 22.

An ALJ may reject the opinion of an examining or treating physician if a state agency consultant proffered a contradicting opinion, even if the consultant neither treated nor examined the claimant. Morales, 225 F.3d at 317. Having been presented with differing opinions, one pointing to marked

mental limitations, and one indicating that Jackson would be able to meet the demands of competitive work on a sustained basis, the ALJ was required to credit one opinion over the other. The ALJ properly rejected the opinion of the examining physician and credited the evidence presented by the psychological consultant. This decision was supported by substantial evidence, particularly in light of Jackson's improvement with medication. See, Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 362 (3d Cir. 2011) (a state agency physician opinion may constitute substantial evidence where that opinion "was properly considered by the ALJ").

Jackson also argues that the ALJ erred in failing to give controlling weight to the opinion of Dr. Yaroslavsky, her treating physician. As an initial matter, the ALJ only rejected Dr. Yaroslavsky's GAF scores, not his objective findings. Tr. 22. The ALJ rejected the GAF scores because they were "not supported by the clinical evidence and the claimant's own representations of feeling better," as well as her request to be seen only once every two months. Id. Additionally, the ALJ noted that the GAF scores were a snapshot of Jackson's functioning, and did not reflect her longitudinal functioning. Id.

The reasoning provided by the ALJ for rejecting Dr. Yaroslavsky's conclusory GAF scores was sufficient. While the GAF scores indicate some moderate to severe symptoms, Dr. Yaroslavsky did not elaborate further on what those symptoms may be. Dr. Yaroslavsky did not detail any limitations that Jackson may have faced had she attempted to re-enter the workforce, and did not offer any assessment of Jackson's residual functional capacity. Furthermore, even if the ALJ had credited the GAF scores, they would not have mandated a finding that Jackson was disabled. See, Gilroy v. Astrue, 351 F.App'x 714, 715-16 (3d Cir. 2009).

### D.      Hypothetical Question Posed to the Vocational Expert

Jackson argues that the questions posed by the ALJ to the vocational expert were flawed because they did not include the limitations expressed by Dr. Picciotto. A "vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the [ALJ's hypothetical] question accurately portrays the claimant's individual physical and mental" limitations. Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984). However, the hypothetical question need not convey every alleged impairment. The hypothetical question must convey only "a claimant's *credibly established limitations*." Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005) (emphasis in original).

Here, the ALJ's hypothetical question did not include any limitations in Jackson's ability to deal appropriately with the public, as Dr. Picciotto had opined. Tr. 68-71. Thus, if the ALJ had accepted Dr. Picciotto's assessment, the hypothetical questions would have been flawed. However, the ALJ properly rejected the opinion of Dr. Picciotto, consequently, the limitations contained within Dr. Picciotto's opinion were not credibly established. Thus, the ALJ was not required to present these limitations to the vocational expert, Rutherford, 399 F.3d at 552, and the vocational expert's testimony constituted substantial evidence at step five of the sequential evaluation process.

A. The ALJ's Development of the Record

Jackson argues that the ALJ failed to fully and fairly develop the record, particularly in light of the fact that Jackson was unrepresented at the administrative hearing.[10] An ALJ "owes a duty to a pro se claimant to help him

---

[10] Jackson also argues that there was a possibility that she had "borderline intellectual functioning" and therefore, it is "possible" that she may not have

or her develop the administration record," Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003), and must "assume a more active role" in developing the record in such instances. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir. 1979). Where a claimant is unrepresented at the administrative hearing, "the ALJ must scrupulously and conscientiously probe in, inquire of, and explore for all the relevant facts." Reefer, 326 F.3d at 380 (quoting Key v. Heckler, 754 F.2d 1545, 1551 (9th Cir. 1985)).

The ALJ fulfilled her duty to develop the administrative record. During her testimony, Jackson stated that she had continued to receive mental health treatment from T.W. Ponessa. At this point, the ALJ asked Jackson to sign a release form so that the ALJ could obtain records from T.W. Ponessa. Tr. 45. The ALJ then asked Jackson if all of her visits to medical facilities, with the exception of T.W. Ponessa, were contained within the medical records available at the administrative hearing. Jackson replied that they were. Id.

Moments later, the ALJ asked if Jackson had been treated anywhere other than T.W. Ponessa. Jackson replied that she had been treated at Hamilton Health. Tr. 46. The ALJ then asked if there were any other places where Jackson had received mental health treatment. Id. Jackson stated that she had been treated while in Dauphin County Prison. Id. After further inquiry, Jackson stated that she had also been to the Harrisburg Hospital emergency room. Tr. 47. Jackson testified that there were no other medical records that the ALJ would need to seek out. Tr. 47-48. The ALJ reiterated that the Social

knowingly and intelligently waived her right to counsel. Such a conclusory and equivocal argument is insufficient to sustain Jackson's burden of proof. Additionally, this argument is undermined by the fact that Jackson was never diagnosed with borderline intellectual functioning, she completed high school while taking regular classes, and she obtained an associate's degree in business management. Tr. 54, 203, 358.

Security Administration was "trying to do the best we can for you in the hearing and I can't do the best job I can for you in the hearing if your medical records aren't here." Tr. 48.

The ALJ then walked through the medical records step by step to ensure that there were no missing records. Tr. 49-50. The ALJ asked if there were any additional medical records from Paxtonia Foot Center after January 2010. Jackson stated that there were not. Tr. 49. The ALJ the inquired about Kline Health Center. Jackson stated that she had stopped treatment there. Tr. 49-50. The ALJ then reiterated that she would seek medical records from T.W. Ponessa, Harrisburg Hospital, and Hamilton Health Center. Tr. 50. The ALJ once again asked Jackson if there was anywhere else that she needed to seek medical records from. Id. Jackson replied "no." Id. Prior to the end of the administrative hearing, the ALJ again asked Jackson if there was "[a]nything else that you, any other places you think we should get medical records from or anything else that we need?" Tr. 74. Jackson again stated that there was not. Id.

While the Third Circuit had not "prescribe[d] any particular procedures that an ALJ must follow" in developing the record, Reefer, 326 F.3d at 380, it is hard to imagine that the ALJ could have been more thorough or diligent in her efforts to secure all relevant medical record. The ALJ asked Jackson eight separate times if there were any further medical records that should be obtained. Tr. 45-50, 74. During the final five inquiries, Jackson unequivocally stated that there were no other medical records that the ALJ should obtain. Tr. 47-50, 74. The ALJ thoroughly inquired as to the existence of any additional medical records and, short of mailing forms to every medical provider in the nation, there was nothing further the ALJ could have done to develop the

medical record.[11] Therefore, the ALJ did fully and fairly develop the medical record.

In addition to the medical evidence, Jackson argues that the ALJ failed to obtain non-medical evidence relating to Jackson's school records, a job development program, and Jackson's Case Management Unit records. In making this argument, Jackson has not detailed what this evidence may show, nor has Jackson made any argument that this evidence would have affected the outcome of the case. Consequently, failure to obtain these non-medical records constitutes, at most, harmless error. See, Rutherford, 399 F.3d at 553 (holding that remand was not required where an error "would not affect the outcome of the case"); Shinskei v. Sanders, 556 U.S. 396, 409 (2009) ("This Court had said that the party that seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted") (internal quotations omitted).

### E. Newly Submitted Evidence

Sentence six remand is warranted "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." Milano v. Comm'r of Soc. Sec., 152 F.App'x 166, 171 (3d Cir. 2005) (quoting 42 U.S.C.

---

[11]The ALJ had indicated that she would seek records from PrimeCare Medical, Inc. Tr. 46-47. These records were not contained within the administrative record. It is unclear if the ALJ failed to request these records, or whether they were requested and never provided. Due to the ambiguity of this situation, this Court cannot hold that the ALJ erred in failing to obtain these records. In any event, as detailed in subsection C, these records demonstrate that Jackson's condition improved with medication, and therefore if any error occurred, it would have been harmless. Rutherford, 399 F.3d at 553.

§ 405(g)). Evidence is new if it was "not in existence or available to the claimant at the time of the administrative proceeding." Sullivan v. Finkelstein, 496 U.S. 617, 626 (1990). "The materiality standard requires that there be a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination." Szubak v. Sec'y of Health & Human Servs., 745 F.2d 831, 833 (3d Cir. 1984). Furthermore, "an implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." Id.

Here, remand is not warranted based on the evidence submitted after the ALJ's decision for two reasons: first, the evidence is not "new" and second, the evidence is not material. Nearly all of the evidence submitted by Jackson was in existence prior to the ALJ's decision and was available to Jackson. Tr. 421-618; Doc. 10, Ex. B. The only evidence was not in existence at the time the ALJ issued her decision was a single "progress note" dated November 27, 2012. Tr. 502-03. Other than that note, none of the evidence was "new," and thus remand is not warranted based on that evidence. Sullivan, 496 U.S. at 626.

Second, the evidence that Jackson presented is not material. The appointment notes from Dr. Yaroslavsky document that Jackson's condition improved throughout 2011, thereby confirming the evidence that was already contained within the administrative record. Tr. 570-75. This evidence does establish that Jackson continued to receive treatment for her mental health issues, however, the ALJ never suggested that Jackson was not receiving ongoing treatment. Tr. 22. Medical records from PrimeCare Medical, Inc.,

during Jackson's incarceration, likewise confirm that Jackson's condition improved after she was provided with anti-psychotic medications. Tr. 509-37, 555-58.

The Guardianship Agreement and Temporary Consent Order are unrelated to Jackson's impairments, and are only useful in determining Jackson's ability to care for her children. Tr. 584-91. However, both agreements were executed while Jackson was in prison, and do not bear directly on her ability to care for her children. Id. Additionally, the Guardianship Agreement shows that, after being released from prison, Jackson reasserted her parental rights over one of her children. Tr. 584.

The evidence presented by Jackson also consists of three opinions stating that Jackson was temporarily disabled; no doctor ever opined that Jackson would be disabled for longer than one year. Tr. 560-62, 567-69. Furthermore, none of the opinions were supported by an assessment of specific functional restrictions, nor were they supported by reference to any objective medical evidence or findings. Id. As an initial matter, Jackson has not demonstrated how these documents would have impacted the ALJ's decision.

Additionally, the ALJ had already considered one document stating that Jackson was temporarily disabled for a period of six months. Tr. 22. The ALJ gave little weight to this opinion, reasoning that it: (1) only established a brief period of disability, (2) was not supported by an assessment of specific functional restrictions, and (3) was "rendered for the sole purpose of obtaining medical assistance benefits." Id. All three reasons apply with equal force to the opinions that Jackson submitted after the ALJ rendered her decision, and the ALJ likely would have rejected such evidence for the same reasons. Thus,

there is no indication that this evidence would have affected the outcome of the ALJ's determination. Consequently, the evidence submitted by Jackson was neither new nor material, and remand based on this evidence is not warranted.

**4.    Conclusion**

A review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. Pursuant to 42 U.S.C. §405(g), the decision of the Commissioner affirmed.

An appropriate Order will be entered.


*s/ Malachy E. Mannion*
MALACHY E. MANNION
United States District Judge

Dated: September 30, 2014
O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2013 MEMORANDA\13-0886-01.wpd